No. 49,913

STATE OF KANSAS, *Appellee*, v. HENRY PONDEXTER, *Appellant.*

(590 P.2d 1074)

Opinion filed February 24, 1979.

*Robert L. Mitchell,* of Wichita, argued the cause and was on the brief for the appellant.

*Curt T. Schneider,* attorney general, *Vern Miller,* district attorney, *Robert J. Sandilos,* assistant district attorney, and *Phillip Miller,* legal intern, were on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: Henry Pondexter seeks to have a conviction for direct contempt of court and a sentence of ninety days in jail set aside. The conviction and sentence were entered in the Sedgwick County District Court. Appellant attacks his conviction (1) for insufficient evidence to support the conviction, (2) for failure of

the judge to warn appellant that his conduct was contemptuous, and (3) for failure of the judge either to cite appellant instantaneously for said contemptuous conduct or to recuse himself and have an impartial judge determine the accusation in contempt.

The circumstances giving rise to the accusation and conviction were as follows: Hon. D. Keith Anderson, associate district judge, was holding court on February 17, 1978, and was concerned with the first appearance of Sydney E. Bryant, charged with felony theft. Henry Pondexter, a codefendant, was present in the courtroom although he had been bonded out previously on the same charge and was not in police custody. The Bryant case had been set for 10:00 a.m. When the case was called Mr. Bryant was advised of the charge, and he filed an affidavit of indigency. An attorney was assigned to him, and a bond was set for later appearance. Mr. Bryant became upset over the amount of the bond and expressed his feelings to the judge. When he was ushered from the courtroom in the custody of police officers he stopped where his codefendant, Pondexter, was sitting and talked to him briefly. Bryant then left the courtroom. Pondexter then engaged the judge in an uninvited conversation in the courtroom. Pondexter attempted to interrogate the judge about the Bryant bond with argumentative and rapid-fire questions. At that time Judge Anderson was in the process of beginning a preliminary hearing in the case of State v. McGehee, No. 78 CR 96. He informed Pondexter that the Bryant matter was concluded. Pondexter continued to publicly question the judge until the judge finally advised Pondexter to leave the courtroom. Pondexter started to leave but stopped half way down the aisle, turned around, and glared defiantly at the judge. The judge asked an administrative officer to escort Pondexter from the courtroom. Pondexter was taken from the room seemingly against his will. When the administrative officer returned he advised the judge confidentially that Pondexter had made threatening remarks to the officer while in the hallway outside the courtroom.

Judge Anderson proceeded with the preliminary hearing in the McGehee case. At 10:30 a.m., while the McGehee hearing was in progress, Mr. Pondexter reentered the courtroom. At that time he was wearing a heavy coat which he had not been wearing previously. He seated himself in the back of the courtroom and began glaring in an angry manner at Judge Anderson. The judge,

recalling the threat made to the officer, suspected that the coat might have been worn to conceal a weapon. He then wrote the following note:

"Bill —

"I would like some assistance. The black male in the back of the room is the one I directed to leave earlier.

"Ray —

. . . .

"had to 'escort' him out and he said he would 'be back for' either Ray or me. He is *now* —

. . . .

"wearing a coat which he was not earlier wearing."

Bill Fox, an administrative officer, was summoned by activating a secret buzzer. He was given the note without a display to others in the courtroom. The McGehee hearing was proceeding during this time. Officer Fox left by the side door and reentered the courtroom from the rear. He showed Pondexter his identification by opening his badge case. Pondexter was asked to "please come outside." When Pondexter made no effort to leave the officer warned him that if he did not leave the courtroom he would be arrested. He remained seated. Deputy Sheriff Dana Hostetler was in the courtroom and the judge motioned for him to assist Officer Fox. Hostetler ordered Pondexter to get up and come with him. A scuffle occurred when Pondexter resisted and said "I don't have to go." He was forced to the floor, handcuffed and taken from the courtroom.

Judge Anderson had to halt the hearing in the McGehee case because of the disturbance which resulted from the appellant's refusal to leave the courtroom. After Pondexter had been removed, Judge Anderson proceeded with and completed the McGehee hearing. A nonrelated suppression motion followed and it was heard in the case of State v. McCleary, No. 77 CR 2322, before the noon recess. Judge Anderson then notified Robert L. Mitchell, an attorney, that he was being assigned to represent the appellant in direct contempt proceedings to be heard that afternoon.

The contempt proceeding that afternoon was presided over by Judge Anderson who dictated an accusation in contempt into the record in open court with appellant and his appointed attorney present. The judge iterated the happenings of the morning, as he had viewed them, and advised appellant that the contempt accusation was based on:

"[F]irst of all, for being back after I had directed him to leave the courtroom, secondly, for disrupting the proceedings that were at hand, specifically, the Preliminary hearing in process in the case of *State of Kansas* vs. *William W. McGehee*, 78 CR 96, the disruption of those proceedings occurring in two manners, in my opinion, first, the manner and dress that I have described on the record in which Mr. Pondexter came back into court, and the manner in which he glared at me, secondly, in not responding to the requests and directions and orders of Mr. Fox to leave, and the specific directions and orders of Deputy Hostetler to leave the courtroom, it being necessary, as I have already indicated, for me to disrupt and temporarily terminate that Preliminary hearing in order to effect the removal from the courtroom of Mr. Pondexter."

Thereafter appellant's attorney made a statement to the court reciting appellant's view of what had occurred. This was followed by a personal statement by Pondexter, the appellant.

On his own behalf the appellant gave the following reply. When he was approached by Officer Fox and asked to come outside he did not understand what Fox wanted. He advised Fox that he would come and he got up to leave. He was walking his normal pace when Hostetler pushed him. Appellant said he came back into the courtroom to watch the court proceeding, and "I was thinking about apologizing to you because I didn't understand what it meant, you know, what you meant about him having to pay a bond, and if there was another bond, I was going to go and try and get the money for him." Appellant admitted that Officer Fox showed him the case with the badge identification but he said he didn't take time to look at it and didn't know who the officer was. Appellant went on to explain that he had on his platform shoes, that he had suffered two broken legs the previous summer and that he was unsteady on his feet. He stated someone "throwed his leg behind me and throwed me on the ground. When he tried to jump on me, I was trying to defend myself. I did not swing or punch him or something."

After appellant completed his statement the court called Officer Fox and Deputy Hostetler to the witness stand. Their testimony fully corroborated the statement of the judge as to what had transpired, including the veiled threat made by appellant after first being escorted from the courtroom at the end of the Bryant hearing. The officers were examined by the judge, by an assistant district attorney, Mr. Roberts, and by appellant's attorney, Mr. Mitchell.

The officers corroborated the statement of the judge that appellant had refused to leave the courtroom on request and had placed his hands against the door jamb in an effort to resist efforts to lead him from the courtroom. They testified that Pondexter was then forced to the floor, handcuffed and removed from the courtroom against his will. He was not carrying a weapon. They further testified the episode occurred in open court during formal hearings.

Appellant contends the evidence was insufficient to convict him of direct contempt because there was no showing that he had any intent to obstruct justice. He argues that the alleged basis for the contempt consisted of returning to and sitting in the courtroom, and any disruption of court proceedings was precipitated by and must be charged to the officers, not to him.

Before examining this contention we will consider some of the rules which govern contempt hearings. A direct appeal from a conviction of contempt is provided by statute. K.S.A. 20-1205. This court on appeal may affirm, reverse or modify the judgment as justice may require. *In re Sanborn,* 208 Kan. 4, 14, 490 P.2d 598 (1971). On appeal from a conviction of direct contempt this court examines the language and actions of the person convicted and determines anew if such conduct is sufficient to constitute contempt. *In re Gambrell,* 160 Kan. 620, 623, 164 P.2d 122 (1945); *In re Sanborn,* 208 Kan. at 14. In the present case the testimony was recorded at the hearing on the accusation of contempt. This court has reexamined the transcript of the evidence as contemplated by K.S.A. 20-1205.

Contempts committed during the sitting of a court or of a judge at chambers, in its or his presence, are direct contempts. K.S.A. 20-1202. Criminal contempt occurs when the conduct is directed against the dignity and authority of a court or judge acting judicially. Punitive judgment is imposed in vindication of direct criminal contempt. Conduct to be sufficiently gross to constitute criminal contempt must be such as to obstruct or tend to obstruct the administration of justice. *In re Sanborn,* 208 Kan. at 14-15; 17 C.J.S., Contempt §§ 5 (1), 8 b. To constitute direct criminal contempt of a court there must be some open and intended disrespect to the judge or the court officers in the presence of the judge, or such conduct in or near the court as to interrupt or interfere with court proceedings then in progress. *In re Dill,*

*Petitioner,* 32 Kan. 668, 689, 5 Pac. 39 (1884); *In re Sanborn,* 208 Kan. 4, Syl. ¶ 3.

Now we return to appellant's first contention. He argues the evidence was insufficient because all he did was sit in the courtroom. The record completely refutes the premise upon which this argument is based. As a spectator he first interjected himself into the proceedings in the Bryant case by publicly arguing with the judge. He was directed by the judge to leave the courtroom so the judge might proceed with another hearing. He did not do so and was first warned by the judge that he would find himself in trouble. Then it became necessary to have the officer in attendance on the court to escort him from the courtroom. Approximately thirty minutes thereafter appellant returned while the court was in session.

A judge not only has the authority but also the duty to protect those in attendance during court proceedings from possible violence. Since the threat Pondexter had made was communicated to the judge by an officer of the court it was entirely reasonable for the judge to attach significance to the heavy coat which appellant had recently acquired and was wearing in the courtroom. In the exercise of that general authority to maintain dignity and to keep order in his own courtroom it was proper for the judge to arrange to have the appellant searched for possible weapons. The manner of accomplishing this purpose appears to have been reasonably calculated to ensure the safety of those present with a minimum amount of disruption. Considering the former actions and statements of the appellant when he was previously escorted from the courtroom and his subsequent actions which appear to have been in open defiance of repeated requests of the court officers, deliberately calculated to cause a court disturbance, we find appellant was guilty of direct contempt. Such actions of the appellant amounted to open and intended disrespect to the court and its officers. Such actions occurred while court was in session and were such that they interrupted and interfered with court proceedings then in progress.

The second point raised by appellant is based upon *United States v. Seale,* 461 F.2d 345 (7th Cir. 1972). It concerns alleged failure of the judge to warn the appellant that his actions would be contemptuous. In *Seale* the contemner represented himself in a criminal prosecution. His courtroom behavior while making

objections and statements during the trial were the basis for his contempt convictions. It was held that to support a contempt conviction and establish the requisite intent to obstruct the administration of justice it was required there be a volitional act done by one who knows or should reasonably be aware his conduct is contemptuous. We agree with that statement of the law. However, there can be little doubt that appellant in the present case knew or reasonably should have been aware that his conduct was contemptuous. He occupied the status of a spectator in the courtroom during both incidents. At the end of the Bryant hearing he was advised by the judge that he would find himself in trouble if he continued to argue with the judge and that he should leave the courtroom. Instead of complying with the court's order he refused to leave and had to be led from the courtroom. After having made a veiled threat to the officer he returned to the courtroom thirty minutes later in a defiant mood. He was asked to leave a second time and he replied he did not have to do so. He was advised at that time he would be arrested if he continued to refuse to leave. Thereafter he resisted the officers and engaged in a physical struggle in the courtroom. He attempted to prevent the officers from removing him. All these actions were those of a young man who testified later at the hearing that he was interested in becoming a lawyer and had spent quite a bit of his free time watching trials. He was no stranger to courtrooms and his contemptuous conduct was not through ignorance.

Under these facts and circumstances it cannot be said there was further need of a warning to protect the appellant against possible unfair surprise of being cited for contempt because of conduct which he could not reasonably have believed to be improper when committed. This was no case of borderline contemptuous behavior. Appellant's conduct was repeated in the face of warnings and was blatantly improper.

The final question presented concerns the propriety of the judge's decision to postpone the hearing of contempt until later in the day, at which time he conducted the proceedings and failed to recuse himself. The appellant relies on *Mayberry v. Pennsylvania,* 400 U.S. 455, 27 L.Ed.2d 532, 91 S.Ct. 499 (1971), to support his main contention that the conviction must be set aside because Judge Anderson failed to recuse himself. Appellant argues that a judge is required either to cite appellant for con-

tempt immediately when the conduct occurs or if the citation is to be delayed, to disqualify himself and allow another judge to preside at the contempt hearing.

In *Mayberry* the petitioner and two codefendants were tried in State court for prison breach and holding hostages in a penal institution. The defendants represented themselves at this trial. During a *twenty-one day trial* Mayberry consistently and viciously insulted and slandered the trial judge. At the conclusion of the trial the judge found the petitioner *guilty of eleven criminal contempts* and *sentenced* him *from 11 to 22 years.* The Supreme Court reversed. The court holds in *Mayberry* that under the circumstances of that case "the Due Process Clause of the Fourteenth Amendment" required that the petitioner be afforded "a public trial before a judge other than the one reviled by the contemnor." 400 U.S. at 466. The court makes clear that the trial court could have acted instantaneously, holding petitioner in contempt as each outburst took place. Such power is necessary to ensure the orderly conduct of the court's business. "Where, however, he does not act the instant the contempt is committed, but waits until the end of the trial, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place." 400 U.S. at 463-464. The court in *Mayberry* concludes that "a judge, vilified as was this Pennsylvania judge, necessarily becomes embroiled in a running, bitter controversy. No one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication." 400 U.S. at 465.

We wish to note in the present case there was no personal vilification of the judge and unlike the judge in *Mayberry,* Judge Anderson did not become embroiled in a running, bitter controversy with the contemner.

In *Taylor v. Hayes,* 418 U.S. 488, 41 L.Ed.2d 897, 94 S.Ct. 2697 (1974), the Supreme Court expands upon this principle holding that "contemptuous conduct, though short of personal attack, may still provoke a trial judge and so embroil him in controversy that he cannot 'hold the balance nice, clear and true between the State and the accused.'" 418 U.S. at 501. The court goes on to explain:

"In making this ultimate judgment, the inquiry must be not only whether there was actual bias on respondent's part, but also whether there was 'such a likelihood

of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.' *Ungar v. Sarafite,* 376 U.S. 575, 588 (1964). 'Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties,' but due process of law requires no less. *In re Murchison,* 349 U.S. 133, 136 (1955)." 418 U.S. at 501.

See generally Annot. 39 L.Ed.2d 1031, 1040-1043; Annot. 64 A.L.R.2d 600.

"It is, of course, not every attack on a judge that disqualifies him from sitting." *Mayberry v. Pennsylvania,* 400 U.S. at 465. Thus, in *Ungar v. Sarafite,* 376 U.S. 575, 11 L.Ed.2d 921, 84 S.Ct. 841, *reh. denied* 377 U.S. 925, 12 L.Ed.2d 217, 84 S.Ct. 1218 (1964), the court holds that a lawyer's conduct though "disruptive, recalcitrant and disagreeable" was still not "an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification." 376 U.S. at 584. In reaching this decision the court is especially impressed with the fact the judge "did not purport to proceed summarily during or at the conclusion of the trial, but gave notice and afforded an opportunity for a hearing which was conducted dispassionately and with a decorum befitting a judicial proceeding." 376 U.S. at 588.

Considering the foregoing it appears that where direct criminal contempt occurs when the contemner is either a party or an attorney for a party in a criminal trial proceeding any disruptive, recalcitrant and disagreeable act should be punished summarily to forestall additional contemptuous conduct. Where, however, the contemner is only a spectator at the court proceeding which he disrupts by words or conduct it may be entirely proper to have him removed from the courtroom and cite him for direct criminal contempt later when there is a break in the ongoing court proceedings which were disrupted. When the conduct of the contemner consists of personal vilification or an attack upon the integrity of the presiding judge, the judge should recuse himself and another judge should be called to hear and determine the charges. However, a judge is not always disqualified from hearing a direct criminal contempt, the basis for which arose while he was previously presiding in court. When the words or conduct of the contemner are not such as to constitute an insult to the judge personally or attack his judicial integrity, it may be proper for that judge to give notice, afford full opportunity for a hearing, and conduct a judicial hearing dispassionately and with fitting de-

corum. When this has been accomplished the contemner's due process rights have been adequately protected regardless of which judge presided at the contempt hearing.

We are convinced the appellant was afforded a fair judicial hearing and under the facts and circumstances his due process rights were protected. In arriving at this conclusion we are impressed with certain matters bearing thereon. The actions of the appellant were not during his own trial where his continued presence in court was required. His removal from the courtroom better served the immediate need for order in the court and enhanced the dignity and decorum of the ongoing court proceedings. Since several additional court matters had been scheduled previously for that morning and required the attendance of other parties, witnesses and attorneys, a delay of the citation for contempt until that afternoon accommodated those persons called for the morning session.

We are further impressed with the fact that Judge Anderson appointed an attorney on behalf of the contemner prior to the afternoon hearing and afforded appellant a full judicial hearing rather than to proceed summarily. In reviewing the transcript of the hearing we discern a calm detachment on the part of the judge at the hearing which resulted in a fair adjudication. An assistant district attorney appeared and took part in prosecuting the contempt proceedings. The afternoon hearing was conducted by Judge Anderson dispassionately and with decorum befitting such a judicial proceeding. Considering all the circumstances attending, including the evidence adduced and the sentence of ninety days meted out, we are of the firm opinion that appellant's due process rights were adequately protected and he was afforded a full, fair and impartial hearing on the accusation.

Judgment is affirmed.